UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| MATTHEW DAVID CASTRO, <br><br> Petitioner, <br><br> v. <br><br> WARDEN, <br><br> Respondent. | CAUSE NO. 2:24-CV-379-PPS-JEM |

OPINION AND ORDER

Matthew David Castro, by counsel, filed a habeas corpus petition under 28 U.S.C. § 2254 to challenge his conviction in Porter County, Indiana Superior Court for murder. He claims to have received ineffective assistance of counsel in violation of the Sixth Amendment. Castro did not receive ineffective assistance of counsel. And even if he did, the alleged errors he raises are trifles, meaning that there is not a reasonable probability that, but for counsel's errors, the results of the trial would have been different. For these reasons the habeas petition must be denied.

**Factual Background**

I'll start with the facts as set forth by the Court of Appeals of Indiana, which I must presume are correct under 28 U.S.C. § 2254(e)(1) unless they are rebutted with clear and convincing evidence:

> In March 2021, Michael Overton, Castro's best friend, lived with Castro in Castro's studio apartment. On March 21, 2021, Castro's upstairs neighbor called 911 multiple times due to loud noises including fighting, music, and yelling, and Castro attempting to enter her apartment. At 8:11 p.m., Castro's mother called 911 and stated that Castro called her, seemed disoriented,

and told her that something was wrong with his friend and he might have killed him.

Valparaiso Officers were dispatched to Castro's apartment. Castro answered the door and had blood on his face, cuts on his hand, a cut on the left side of his head, watery and bloodshot eyes, and the odor of alcohol coming off of him as he spoke, and he "was just overwhelmed with emotion." One of the officers asked Castro if he was in a fight with someone, and Castro nodded. Castro said Overton "got the best of him."

Officers discovered Overton's severely beaten and deceased body and observed that he had "lividity on his arms" and "no color to his skin." Officers transported Castro to a patrol vehicle, Castro was uncooperative, and officers placed a spit hood and "flex cuffs" on him. After being placed in an interview room, Castro stated that he would probably execute officers if his restraints were removed and that he would hurt anyone who came close to him.

Officers obtained a search warrant for Castro's blood. During a blood draw, Castro repeatedly told the laboratory medical technologist that he "killed somebody." An autopsy revealed that the cause of Overton's death was multiple blunt force trauma to the head and neck.

The State charged Castro with murder. At the beginning of voir dire, the court informed the potential jurors:

The Defendant is not required to present any evidence to prove his innocence or to prove or explain anything. The entire burden rests upon the State of Indiana. You should attempt to fit the evidence to the presumption that the Defendant is innocent, and the theory that every witness is telling the truth.

The court admitted a bodycam recording which showed law enforcement asking Castro if he was in a fight with someone and Castro nodding. The court also admitted a jail phone call in which Castro stated that he thought he "beat up Michael" and "the next thing" he knew the cops arrived.

On February 27, 2023, Castro's counsel filed a proposed jury instruction on involuntary manslaughter which provided in part: "A person who kills another human being while committing or attempting to commit battery commits involuntary manslaughter, a Level 5 felony." When the court asked defense counsel why he thought the instruction was appropriate, he answered that there had been evidence presented that Castro committed a

2

>battery, "this is your classic involuntary manslaughter fight occurred in a bar parking lot, and somebody passed away from a fight." The trial court denied the proposed instruction. The jury found Castro guilty as charged.

*Castro v. State*, 241 N.E.3d 612 (Ind. Ct. App. 2024); ECF 4-6 at 2-4.

Castro asserts three acts of alleged ineffectiveness by his trial counsel: 1) that he failed to request a jury instruction on voluntary manslaughter; 2) that he failed to object to an instruction during jury selection; and 3) that he failed to object to allowing juror questioning of witnesses and to one question in particular.

## Discussion

The court can grant an application for habeas relief if the adjudication of the petitioner's claim in State court either (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Obtaining habeas relief is a tall order. This is because such relief only "exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quotations and citation omitted). The exacting standard requires a habeas petitioner "to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (quotation marks and citations omitted).

3

Criminal defendants are entitled to a fair trial but not a perfect one. *Rose v. Clark*, 478 U.S. 570, 579 (1986). To warrant relief, a state court's decision must be more than incorrect or erroneous; it must be objectively unreasonable. *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted).

One vehicle for obtaining habeas relief is by showing the petitioner received ineffective assistance of counsel during his state court proceedings. But this too is a heavy lift. To prevail on an ineffective assistance of counsel claim, a petitioner must show that counsel's performance was deficient, and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668 (1984). As to the first prong of the *Strickland* inquiry, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (quotation marks and citation omitted). Decisions related to trial strategy "are virtually unchallengeable." *Id.* at 690.

As for the second *Strickland* prong—prejudice—the test is whether there was a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Id*. In assessing prejudice under *Strickland* "[t]he likelihood of a different result must be substantial, not

4

just conceivable." *Harrington*, 562 U.S. at 112. However, "[o]n habeas review, [the] inquiry is now whether the state court unreasonably applied *Strickland*[.]" *McNary v. Lemke*, 708 F.3d 905, 914 (7th Cir. 2013). "Given this high standard, even 'egregious' failures of counsel do not always warrant relief." *Id.* (citation omitted).

With these standards in mind, I'll turn now to Castro's various claims of error.

**1. Failure to Request a Voluntary Manslaughter Instruction**

Castro argues that he is entitled to habeas relief because trial counsel failed to request a jury instruction on voluntary manslaughter. Under Indiana law, "a person who knowingly or intentionally . . . kills another human being . . . while acting under sudden heat commits voluntary manslaughter[.]" Ind. Code § 35-42-1-3(a)(1). "It is well settled in Indiana that the existence of sudden heat is not an element of voluntary manslaughter." *Massey v. State*, 955 N.E.2d 247, 255 (Ind. Ct. App. 2011) (citation omitted). "Therefore, an instruction on voluntary manslaughter assigning the burden of affirmatively proving sudden heat to the State is erroneous as a matter of law." *Id.* (quotation marks and citation omitted). "However, once a defendant presents evidence of sudden heat, to obtain a conviction for murder rather than voluntary manslaughter, the State bears the burden of disproving its existence beyond a reasonable doubt." *Id.* (quotation marks and citation omitted).

Here's how the term "sudden heat" is defined under Indiana law: it is "characterized as anger, rage, resentment, or terror sufficient to obscure the reason of an ordinary person, preventing deliberation and premeditation, excluding malice, and rendering a person incapable of cool reflection." *Roberson v. State*, 982 N.E.2d 452, 456

5

(Ind. Ct. App. 2013). "Words alone do not constitute sufficient provocation to warrant a jury instruction on voluntary manslaughter, especially when the words were not intended to provoke the defendant, such as fighting words." *Id.* at 456–57. "Additionally, any alleged provocation must be such that it would obscure the reason of an ordinary man, which is an objective as opposed to a subjective standard." *Id.* at 457. Put another way, "[t]o establish that a defendant acted in sudden heat, the defendant must show sufficient provocation to engender passion." *Clark v. State*, 834 N.E.2d 153, 158 (Ind. Ct. App. 2005) (citation omitted). "[I]f there is no serious evidentiary dispute over sudden heat, it is error for a trial court to instruct a jury on voluntary manslaughter in addition to murder." *Watts v. State*, 885 N.E.2d 1228, 1232 (Ind. 2008).

I was surprised to see Castro relying upon *Griffin v. State*, 644 N.E.2d 561, 564 (Ind. 1994), for the proposition that "it is not erroneous in a murder trial to give the jury an instruction on voluntary manslaughter, even in the absence of evidence of sudden heat." I was surprised because the Indiana Supreme Court expressly overruled *Griffin* in *Watts*, 885 N.E.2d at 1233. ("To the extent that the cases cited by the Court of Appeals from our Court are inconsistent with this conclusion, we now overrule them and hold that it is indeed reversible error for a trial court to instruct a jury on voluntary manslaughter in the absence of evidence of sudden heat.").

Hinting at a possible voluntary manslaughter claim, defense counsel in opening statement said the following:

6

> The elements as stated in the instructions suggest that Matthew Castro, in Porter County, knowingly or intentionally killed Michael Overton. There's a lot of ways people die. Sometimes they can die by accident; sometimes they can die in a reckless manner due to reckless activity. Sometimes they can die unintentionally. You fight somebody and they die. That's not intentional murder. Intentional killing of somebody is you intend to kill them, and that's what this trial is going to be focused on. You know, this was in an apartment; this wasn't in a bar fight. This wasn't in the woods at a campground. You know, there's knives, all kinds of weapons that are capable of killing someone. This was -- the incident occurred when two people were hanging out after a night of drinking, and Matthew Castro woke up to a guy who he allowed to stay in the room, someone he considered a brother, he's dead in the room.
>
> The State's going to have to come in here and bring evidence to come in here and convince you with proof beyond a reasonable doubt that an intentional killing occurred; a knowing and intentional killing occurred. The evidence is not going to show that. The evidence is not going to prove that. And it's their burden to come in and bring this convincing proof that you can act and rely upon it in a matter of the highest importance. It has to be so convincing that it removes reasonable doubt. And at the conclusion of the evidence, I'm going to ask you to find Matthew Castro not guilty of murder. They're not going to be able to prove this was an intentional killing, because it wasn't. That's why I'm going to ask you to find him not guilty.

ECF 6-2 at 149-50.

At trial, the prosecution presented thirty-four witnesses. *See* ECF 6-1. In the habeas petition, Castro offers the following trial testimony as appreciable evidence of sudden heat: Castro's mother described Castro and the victim's relationship as "[b]est friends, almost brothers; very close." ECF 1 at 18-19 (citing ECF 6-2 at 163). Officer Teufel testified that, as a first responder, he saw Castro when he opened his front door. He described Castro as "just overwhelmed with emotion" and having "blood on his face" and cuts and marks on his hand. ECF 6-2 at 169, 176. Officer Smith testified that Castro had a "cut on the left side of his head near his temple." *Id.* at 194. When Officer

7

Smith asked Castro what happened, Castro responded, "[The victim] got the best of him." *Id.* at 196. Officer Castillo took numerous photographs of Castro at the jail, including pictures of bloody hands, an abrasion on his left arm, and an abrasion on the right side of the face. ECF 6-3 at 77-80. Jeremy Zell testified that he was childhood friends with the victim and had previously lived with the victim and Castro. He described the victim and Castro's relationship as best friends. ECF 6-5 at 9-10. Jamie Benedict, another childhood friend of the victim, similarly testified that the victim and Castro were "normal friends" who were "really close." *Id.* at 57. Detective Pickford testified that blood tests for Castro revealed a blood alcohol content of 0.183 and the presence of THC and that blood tests for the victim revealed a blood alcohol content of 0.27. *Id.* at 179-80, 208.

Additionally, Janice Brueggmann, who resided in the same building as Castro, testified that, around the time of the murder, she heard "more than two people" in Castro's apartment. *Id.* at 82. She also testified that, a short time later, another resident named Roger ran upstairs to his apartment speaking loudly with another individual. *Id.* at 84–85. She testified that, in January 2023, she had told the detective that she could hear Roger screaming, "Get up," from Castro's apartment. *Id.* at 103-04. Roger Gaczkowski testified that he had also resided in the same building as Castro. He testified that, at the time of Castro's arrest, he had just returned from a bike ride. *Id.* at 108. He had planned for a friend to visit him, but the police asked the friend to leave. *Id.* at 109. He had been inside Castro's apartment a single time. *Id.* at 112-16. Gaczkowski

8

also testified that he previously had a physical confrontation with Castro's friend and roommate, Jeremy Zell. *Id.*

At the jury instruction conference, trial counsel advised that he would visit Castro in jail over the weekend to discuss whether Castro would testify and whether to request instructions for lesser-included offenses. *Id.* at 222-23. Trial counsel represented that he had prepared instructions for "some of the potential lesser included [offenses]" and that he would email those to the prosecution. *Id.* at 224. On the following Monday, trial counsel represented that he and Castro had discussed whether to testify throughout the case and on both Saturday and Sunday. *Id.* at 227. Castro told the court that he would not testify. *Id.* Trial counsel then tendered an instruction for involuntary manslaughter that did not require an intent to kill but merely the commission or the attempt to commit battery. *Id.* at 228-34. He argued that "this is your classic involuntary manslaughter fight occur[ing] in a bar parking lot, and somebody passed away from a fight." *Id.* at 229. The trial court declined to submit it to the jury. *Id.* at 232–34.

At closing, trial counsel primarily argued that Roger Gaczkowski was the killer and that, even if Castro had killed the victim, he did not intend to do so. ECF 6-6 at 16-46. He highlighted their relationship as best friends, the lack of a cover up, Castro's injuries, their intoxicated nature, and the lack of weapon use despite the presence of weapons. *Id.* Trial counsel noted Brueggmann's testimony that she had heard Roger Gaczkowski say "get up" and run up the stairs to his apartment and that she also heard the presence of more than two people in Castro's apartment. *Id.* Trial counsel also noted that Roger Gaczkowski had engaged in a previous physical fight with the victim's

9

friend (Zell) and admitted to touching things in Castro's apartment. *Id.* He argued that "people get in fist fights all the time; there's no intent to kill," and that such circumstances amounted to "manslaughter, not murder." *Id.* at 25.

At sentencing, Castro maintained his innocence. He testified that another individual was present in his apartment; that person punched him and rendered him unconscious. *Id.* at 87-88. When he woke up, he found the victim dead. *Id.*

On direct appeal, the Indiana Court of Appeals rejected the claim that trial counsel was ineffective for failing to request an instruction on voluntary manslaughter. ECF 4-6 at 7-9. The appellate court reasoned that the record contained no evidence "as to what precipitated Castro's physical assault on [the victim]" and found no serious evidentiary dispute regarding sudden heat. *Id.* at 8. In the absence of evidence of sudden heat, a voluntary manslaughter instruction would have been improper. *Watts*, 885 N.E.2d at 1233. The appellate court also found that trial counsel might have strategically declined to request such an instruction given the closing arguments that Castro did not kill the victim and that, even if he did, Castro did not intend to kill him. ECF 4-6 at 8–9.

After reviewing the record, I cannot find that the State courts erred on this claim. To start, whether the record contains appreciable evidence of sudden heat is a matter of State law, and "[w]here the state court has ruled that . . . counsel was not ineffective because a state law argument would have failed, that state law ruling is unassailable on habeas, even if it is couched as an ineffective assistance of counsel claim." *Rogers v. Wells*, 96 F.4th 1006, 1012 (7th Cir. 2024); *Lopez v. Thurmer*, 59 F.3d 584, 587 (7th Cir.

10

2010) ("[W]e will not fault counsel as ineffective for failing to advance a position under state law that the state appellate court said was meritless."). And "[b]ecause [I] leave undisturbed the state appellate court's holding that [Castro] was not entitled to a [voluntary manslaughter] instruction, its additional ruling that counsel's performance was constitutionally adequate under *Strickland* was reasonable." *Id.*

Further, given trial counsel's efforts throughout trial, including opening statements, cross-examination, the jury instruction conference, and closing argument, I also cannot find that the State court unreasonably determined that trial counsel's decision not to request a voluntary instruction might have been a strategic decision. These trial efforts indicate that trial counsel intended to persuade the jury that Castro did not kill the victim, but that, even if he did, Castro did not intend to kill the victim. Asking the jury to find Castro guilty of voluntary manslaughter would have been inconsistent with these strategies and also would have likely been inconsistent with Castro's decision not to testify and with Castro's understanding of the events (as shown by his sentencing testimony). Therefore, the claim that trial counsel failed to request a voluntary manslaughter instruction is not a basis for habeas relief.

### 2. Failing to Object to Jury Selection Instruction

Castro argues that he is entitled to habeas relief because trial counsel failed to object to an instruction that directed the jury to presume that all witnesses are telling the truth. He notes that he did not call any witnesses at trial and argues that, in trials where the defendant does not call any witnesses, this instruction is tantamount to an instruction that the jury should believe the prosecution's witnesses.

11

At the beginning of jury selection, the trial court read the following instruction:

> Under the laws of this State and the laws of this country, a person charged with a crime is presumed to be innocent. To overcome the presumption of innocence, the State must prove the Defendant guilty of each element of the crime charged beyond a reasonable doubt. The Defendant is not required to present any evidence to prove his innocence or to prove or explain anything. The entire burden rests upon the State of Indiana. **You should attempt to fit the evidence to the presumption that the Defendant is innocent, and the theory that every witness is telling the truth.**

ECF 6-2 at 9 (emphasis added).

After the jury was selected, the trial court gave Preliminary Instruction No. 8. It was identical to Final Instruction No. 10 read to the jury at the close of the evidence. Here's what it said:

> You are the exclusive judges of the evidence, which may be either witness testimony or exhibits. In considering the evidence, it is your duty to decide the value you give to the exhibits you receive and the testimony you hear.
>
> In determining the value to give to a witness's testimony, some factors you may consider are:
>
> - The witness's ability and opportunity to observe;
> - The behavior of the witness while testifying;
> - Any interest, bias, or prejudice the witness may have;
> - Any relationship with people involved in the case;
> - The reasonableness of the testimony considering the other evidence;
> - Your knowledge, common sense, and life experiences.
>
> You should not disregard the testimony of any witness without a reason and without careful consideration. If you find conflicting testimony, you may have to decide what testimony you believe and what testimony you do not believe. You may believe all of what a witness said, or only part of it, or none of it.
>
> The quantity of evidence or the number or the number of witnesses need not control your determination of the truth. You should give the greatest value to the evidence you find most convincing.

ECF 6-8 at 91, 117. These sets of instructions also informed the jury regarding the presumption of Castro's innocence and the prosecution's burden of proving every element of the offense beyond a reasonable doubt. *Id.* at 82-127. The trial court provided the jury with copies of the instructions during deliberations and encouraged them to review them. *Id.* at 125–26.

On direct appeal, the Indiana Court of Appeals found no deficient performance because the Indiana Supreme Court had previously found that the instruction was not erroneous. ECF 4-6 at 6-7. The appellate court also noted that Preliminary Instruction No. 8 and Final Instruction No. 10 were given to the jury, implying that any harm from the original instruction was softened by the latter two instructions. *Id.*

After reviewing the record, I cannot find that the State court made an unreasonable determination on this claim. This claim also appears to be premised on state law, which is unassailable on habeas review. To the extent it is premised on federal law, *United States v. Hall*, 854 F.2d 1036 (7th Cir. 1988) is instructive. In that case, a co-defendant who did not testify challenged an instruction that "trial witnesses are presumed to speak the truth." *Id.* at 1039-40. The co-defendant argued that "because he did not take the stand, it cannot be assumed that he was truthful." *Id.* at 1040. The Seventh Circuit noted that the instruction was a correct statement of law but found that the instruction was problematic because "the focus on this presumption in a criminal case . . . has been thought to water down the more important presumption of innocence of a non-testifying defendant." *Id.* at 1040-41.

13

I agree that the preliminary instruction given in this case—that witnesses are presumed to speak the truth—is problematic and should probably be retired by the state judiciary. But as the Seventh Circuit concluded in *Hall,* based on the instructions as a whole, "the single phrase on the general assumption of a witness' truthfulness did not conflict with defendants' presumption of innocence or with the government's burden of proof, and did not invade the jury's ability to judge the witnesses' credibility." *Id.* at 1041. As a result, the Seventh Circuit declined to reverse the conviction. *Id.* In reaching this conclusion, the Court relied on *Cupp v. Naughten*, 414 U.S. 141 (1973), in which the Supreme Court of the United States conducted a substantially similar analysis on a substantially similar claim.

Castro's argument is substantially similar to the one made by the co-defendant in *Hall*. And, based on my review of the record as a whole, I similarly find that the single phrase regarding the presumption that every witness is truthful did not conflict with the presumption of innocence, the prosecution's evidentiary burden, or the jury's duty to assess credibility. In the face of strong authority from both the Circuit and the Supreme Court in *Hall* and *Cupp*, use of this preliminary instruction at issue here is not a basis to grant habeas relief.

Finally, let's suppose for the moment that Castro's counsel was constitutionally ineffective for failing to object to the trial judge's preliminary instruction about presuming that witnesses were telling the truth. There is no conceivable way—let alone a reasonable probability—that a single phrase uttered at the outset of jury selection would have resulted in a different outcome of the trial had it not been told to the jury.

14

This is especially true here where the verdict was reached ten days after the offending instruction was read to the jury, 34 witnesses testified, two sets of clarifying instructions were given, and the jury deliberated for nine hours. In other words, the prejudice prong of *Strickland* is not met here.

### 3. Failure to Object to Juror Questioning

Castro argues that he is entitled to habeas relief because trial counsel failed to object to allowing jurors to ask questions to witnesses orally instead of in writing. He also argues that the trial court erred by failing to allow trial counsel an opportunity to object at a sidebar conference before asking a juror's question that include a reference to "murder," thereby placing trial counsel "in the dubious position of having to object to the form of the question in front of the jury." ECF 1 at 23. More broadly, he further challenges the practice of allowing jurors to ask questions at all.

During trial, the prosecution presented Roger Gaczkowski, Castro's neighbor, as a witness. After examination by the prosecution and trial counsel, the following occurred:

> **Trial Court:** Alright. Jurors, do you have any questions for Mister Gaczkowski?
>
> * * *
>
> **Trial Court:** Okay. Alright. There are two questions. The first is: could you hear Castro while in your apartment?
>
> **Gaczkowski:** Sometimes, yeah. I guess he'd like bang on the ceiling or something for Jan or something like that.
>
> **Trial Court:** If so, how loud was Castro's apartment the night of the murder?

15

**Gaczkowski:** I didn't hear anything.

\* \* \*

**Trial Court:** Alright. Does that prompt any follow up questions from counsel?

**Prosecution:** Nothing from the State, Judge.

**Trial Counsel:** No.

ECF 6-5 at 128-30.

On direct appeal, the Indiana Court of Appeals rejected the claim of trial counsel error, noting that the trial judge read the juror's written question rather than allowing the juror to ask it orally. ECF 4-6 at 9. The appellate court noted that, to the extent Castro faulted trial counsel for failing to object after the trial court asked the question, he had also conceded that it was reasonable for trial counsel to do so given the risk of drawing additional attention to the reference to "murder." *Id.* The appellate court also found that Castro had waived his related claims of trial court error by raising them for the first time in a reply brief. *Id.* n.1.

After reviewing the record, I cannot conclude that the State court made an unreasonable determination on the claim of trial counsel error. According to the record, the juror was not allowed to ask the question orally, and trial counsel had no reasonable opportunity to object to the question itself before the trial court read it. Further, as conceded by Castro, trial counsel had a reasonable basis for declining to object to the question thereafter.

16

As the Warden argues, review of the appellate opinion suggests the related claims of trial court error are procedurally defaulted. *See Woodford v. Ngo*, 548 U.S. 81, 93 (2006) ("[I]f state-court remedies are no longer available because the prisoner failed to comply with the deadline for seeking state-court review or for taking an appeal, those remedies are technically exhausted, but exhaustion in this sense does not automatically entitle the habeas petitioner to litigate his or her claims in federal court. Instead, if the petitioner procedurally defaulted those claims, the prisoner generally is barred from asserting those claims in a federal habeas proceeding."); *Thomas v. Williams*, 822 F.3d 378, 384 (7th Cir. 2016) (explaining the two types of procedural default). However, in the initial appellate brief, Castro did challenge the trial court's failure to hold a sidebar conference on the juror questions and argued that it deprived him of his right to a fair trial. ECF 4-3 at 24-27. Consequently, I decline to find that this claim is procedurally defaulted. That said, Castro did not challenge the general practice of allowing jurors an opportunity to ask witnesses questions, so that claim is procedurally defaulted.[1]

To prevail on his claim that the trial court failed to hold a sidebar conference, Castro needs to show "that jurors asked improper questions or that their questions precipitated some other impropriety in the trial, and that the improper questions affected the jury's verdict." *United States v. Sykes*, 614 F.3d 303, 313 (7th Cir. 2010). Here, the trial court likely erred by not either allowing trial counsel a prior opportunity to

---

[1] Nevertheless, I observe that the Seventh Circuit has found on several occasions that allowing jurors to ask witnesses questions is a longstanding and widely permitted practice that is not *per se* prejudicial. *See United States v. Sykes*, 614 F.3d 303, 312-14 (7th Cir. 2010); *S.E.C. v. Koenig*, 557 F.3d 736, 741-43 (7th Cir. 2009); *United States v. Feinberg*, 89 F.3d 333, 336-38 (7th Cir. 1996).

object or rephrasing the question to omit the word "murder." However, I cannot find that the single reference to the word "murder" affected the jury's verdict. Castro offers no specific explanation as to how the improper question might have affected the jury's verdict, and it seems unlikely that the single stray reference had any effect on the jury's verdict rendered three days later. In all likelihood, the jury did not recall the specific phrasing of the question during deliberations. But, even if they had, it would have very likely been rendered immaterial given the volume of evidence submitted for the jury's consideration, closing arguments, and final jury instructions, each of which were replete with references to "murder." This was, after all, a murder trial. Therefore, the claims relating to the juror questioning of witnesses is not a basis for habeas relief.

## Certificate of Appealability

Pursuant to Section 2254 Habeas Corpus Rule 11, I must grant or deny a certificate of appealability. To obtain a certificate of appealability under 28 U.S.C. § 2253(c), the petitioner must make a substantial showing of the denial of a constitutional right by establishing "that a reasonable jurist could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quotation marks and citation omitted). For the reasons explained in this order, there is no basis for encouraging Castro to proceed further.

For these reasons, the court DENIES the habeas corpus petition (ECF 1); DENIES a certificate of appealability pursuant to Section 2254 Habeas Corpus Rule 11; and

DIRECTS the clerk to enter judgment in favor of the Respondent and against the Petitioner.

SO ORDERED on January 13, 2026.

/s/ Philip P. Simon
JUDGE
UNITED STATES DISTRICT COURT